**WHITLOCK CORPORATION**
v.
**UNITED STATES.**

No. 32–54.

United States Court of Claims.

March 5, 1958.

Noel W. Hauser, New York City, for plaintiff. Alfred S. Julien, New York City, was on the brief.

Francis P. Borden, Jr., Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LITTLETON, Judge.

Plaintiff sues to recover amounts withheld by defendant under contracts which were admittedly performed. The defendant counterclaims for a larger amount representing excess costs allegedly sustained when an earlier supply contract between the parties was terminated for default and the goods repurchased elsewhere at greater cost. The controversy, therefore, centers on the counterclaim.

On March 7, 1952, the plaintiff, a wholesale hardware jobber, contracted to supply the Philadelphia Quartermaster Depot with 1,175,400 brass buckles at unit and total prices of $0.064 and $75,-225.60, respectively, pursuant to an invitation of the preceding December and plaintiff's low bid thereon of January 9, 1952.[1] Since plaintiff was not a manufacturer it planned to subcontract the entire order, basing its bid on a commitment which it had obtained from The Hatheway Manufacturing Company, a small Connecticut manufacturer. Plaintiff had never dealt with Hatheway previously, but secured its name from a trade register which reported Hatheway to have been in business for over 50 years and to have what plaintiff considered to be an adequate credit rating. Hatheway offered to manufacture and deliver the buckles at a unit price of $0.05785. Neither plaintiff nor Hatheway had previously supplied or manufactured such an article and neither was familiar with the costs involved.

Plaintiff had specified clearly in its bid that the entire contract was to be performed by Hatheway under subcontract. Paragraph 27 of the General Provisions, Supply Contract, which accompanied plaintiff's bid and became part of the subsequent contract, provided in part:

"27. Names and Location of Factories

"The names and locations of the factories where manufacture of the items bid upon will be performed are set forth herein. The performing of any of the work contracted for in any place other than that named herein is prohibited, unless the same is specifically approved in advance by the Contracting Officer. * * *"

The time for acceptance of plaintiff's bid was extended to March 20 by mutual consent to afford defendant an opportunity to make a preaward survey of Hatheway's facilities, pursuant to authority in the Armed Service Procurement Regulations. Although the record does not establish that such a preaward survey was made, the contract was awarded to plaintiff on March 7, 1952, and plaintiff immediately ordered Hatheway to proceed with the subcontract. The contract delivery dates were postponed one month so as to require fixed monthly quantities from May 30 through October 31, 1952. Plaintiff's subcontract with Hatheway did not specify delivery dates, but plaintiff informed Hatheway later in March of the requirements.

Hatheway experienced difficulties in preparing its special jigs and dies, and plaintiff unsuccessfully requested defendant for a change in brass specifications. On July 9, 1952, with no buckles then or

---

1. Applying the 1% discount to which the Government would have been entitled for payment within 10 days, the total price would have been $74,473.34.

thereafter produced, plaintiff learned of Hatheway's insolvency and inability to perform the subcontract. Plaintiff forthwith solicited bids from other manufacturers to complete the contract, obtaining its most favorable offer from Shields Fifth Avenue at a unit price of $0.08. Plaintiff requested defendant without success to be excused from performance, and then asked for an increase in the contract price to $0.08 per unit so that it could subcontract to Shields, without profit to itself. This, too, was refused by the contracting officer.

Meanwhile, on July 18, 1952, the contracting officer terminated plaintiff's contract for default, finding specifically that plaintiff's failure to perform did not arise out of causes beyond its control and without its fault or negligence, and advising plaintiff that the buckles would be procured in the open market and plaintiff would be liable for any excess costs. Plaintiff filed a timely appeal with the Secretary of the Army who, through the Armed Services Board of Contract Appeals, affirmed the contracting officer on August 27, 1953, after a hearing. The contracting officer, after issuing an invitation to numerous suppliers and securing 14 bids, awarded a repurchase contract to Dorset Products, Inc., on October 1, 1952, at unit and total prices of $.08399 and $98,721.86. Dorset Products, Inc., was the lowest responsible bidder on the repurchase invitation, the lowest bidder having been properly rejected for just cause. Under this contract defendant paid Dorset $98,366.86 for the buckles, representing an excess of $23,893.52 over the price of $74,473.34 in plaintiff's defaulted contract. The contract with Dorset provided for no discount on early payment.

The contracting officer's termination of plaintiff's contract was made pursuant to the following clause 11 of the General Provisions:

"11. Default

"(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

"(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

"(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, *Provided,* That the Con-

tractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

\* \* \* \* \* \*

"12. Disputes

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: *Provided,* That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

■■ The plaintiff contends that the insolvency of its subcontractor made the contract impossible of performance and thus, pursuant to the default clause quoted above, exonerated it from liability. It says that, since the contract by its terms specifically forbade plaintiff from performing any of the manufacturing operations through means other than Hatheway, unless the contracting officer permitted a change, Hatheway's insolvency and consequent inability to perform, which was both beyond plaintiff's control and due to no fault or negligence on its part, destroyed the mutuality and enforceability of the contract because

plaintiff had no power thereunder to *require* the Government to accept performance by another subcontractor of plaintiff's choosing. As a defense to the counterclaim this is wide of the mark. It is true that contracts based upon a sole source of supply or upon services of a peculiarly personal nature are often unenforceable against the promisor when they become impossible to perform because of elimination of the source beyond the promisor's control, but this is not such a case. Hatheway was not an exclusive source of supply of brass buckles, or so regarded by defendant. Many other manufacturers were able and willing to produce the item, at a price. It can be inferred from the record as a whole that defendant would willingly have permitted plaintiff to perform through another subcontractor at, of course, no additional cost to defendant, but that plaintiff was unwilling to perform the contract at a loss. It would be unrealistic to suppose that the provision placing it within defendant's conceded power to refuse plaintiff permission to substitute subcontractors would make the contract unenforceable against plaintiff until it was shown that plaintiff sought and was denied permission, which was not done. Since buckles were available to plaintiff at greater than its contract price, it was bound to perform and the increased expense alone did not render performance impossible. Williston on Contracts, 1938 ed., sec. 1963.

■ The default provision of the contract excuses the contractor from performance for the default of its subcontractor only if the subcontractor's failure to perform is attributable to certain enumerated causes which are beyond its control and without its fault or negligence. Insolvency of the subcontractor is not included in the enumeration of excuses nor can it be equated to those appearing, for Hatheway's insolvency was not shown to be without its fault or negligence or beyond its control. Plaintiff further offers a completely erroneous interpretation of the default clause to the effect that it is entitled to be excused from

performance because the contracting officer made no determination that the supplies defaulted by Hatheway were obtainable from other sources in sufficient time to permit the contractor to meet the required delivery schedule. The provision is to the contrary, and without ambiguity says that, even if the contractor qualifies under one of the enumerated excuses for nonperformance, it is still liable if the contracting officer finds that the supplies defaulted by the subcontractor could have been obtained elsewhere by the contractor in time to meet the delivery schedule.

■■ Plaintiff next maintains that the contracting officer's finding of fault or negligence is not one of fact which, under the disputes clause, he is permitted to make, but that it is rather one of contract interpretation and thus a matter of law beyond administrative competence. The contracting officer's finding that plaintiff's failure to perform was not beyond its control or without its fault or negligence, which was affirmed by the Armed Services Board of Contract Appeals, was a finding of fact which, under Public Law 356 of the 83d Congress (68 Stat. 81), 41 U.S.C.A. §§ 321, 322, was final and conclusive on the parties absent a showing that the decision was arbitrary, capricious, fraudulent or not based on substantial evidence. Volentine and Littleton v. United States, 145 F.Supp. 952, 136 Ct.Cl. 638. Plaintiff has made no such showing here. But the contracting officer did not make findings on the facts relating to the repurchase contract, for at the time the findings were made the repurchase had not occurred. The Board, however, found that the award of the repurchase contract to the second lowest bidder was proper. To the extent that the Board went beyond the facts found by the contracting officer, this court is not bound to accept its verdict as final. The question is now academic since, proceeding on the facts as presented here, the rejection of the low bid on the repurchase invitation was clearly justifiable. This lowest bid which had been submitted by the Emco Manufac-

turing Company of Brooklyn, New York, was rejected because a preaward survey had disclosed that company to be "unreliable and incompetent" with a past record of poor management and past failure to meet Government specifications and delivery requirements.

■ The commissioner of this court, C. Murray Bernhardt, to whom this case was referred and who conducted the trial, filed with his findings on the facts an opinion on the law. Much of what has preceded here has been drawn from that opinion. The commissioner, while holding against plaintiff and for defendant on the principal issues involved, reached the conclusion that defendant, despite the obvious merits of its counterclaim, could not prevail because it had failed to prove performance and payment of the repurchase contract. The evidence which the Government had chosen to stand on with respect to this all important issue was merely the proof that it had awarded a repurchase contract to Dorset in the amount of $98,721.85, plus a certified copy of a Certificate of Indebtedness from the General Accounting Office stating, *inter alia*, that the total cost to the Government of the repurchase contract with Dorset was in the stated amount. The commissioner was correct in recommending that, as a matter of law, the Certificate of Indebtedness did not constitute proof that the repurchase contract had either been performed or paid for. Mohawk Condensed Milk Company v. United States, 48 F.2d 682, 70 Ct.Cl. 671; Lomax Transportation Co. v. United States, 9 Cir., 183 F.2d 331, 333. The contract with plaintiff provided that where the Government terminates the contract and enters into a repurchase contract "the Contractor shall be liable to the Government for any excess costs for such similar supplies or services." The evidence of any such excess costs is not of course the amount set forth on the face of the repurchase contract, nor in the Certificate of Indebtedness from the General Accounting Office.

Subsequent to the filing of the commissioner's opinion and findings, and there-

fore long after the closing of evidence, the defendant secured from the General Accounting Office and furnished as an offer of proof at the argument of this case before the court, certified copies of the vouchers and cancelled checks covering payment to Dorset under the repurchase contract. In its brief defendant moved for leave to reopen the proof to the extent of having these documents admitted in evidence. Such leave is hereby granted,[2] and with that deficiency in defendant's proof supplied, it is found that the amount paid Dorset on the repurchase contract is $98,366.86 rather than $98,721.88 as stated in the contract itself. The excess cost, therefore, which defendant is entitled to recover from plaintiff is $23,893.92, representing the difference between the $74,473.34 which defendant would have paid plaintiff under its contract and the $98,366.86 paid Dorset. Against this sum plaintiff is entitled to offset those amounts which are admittedly due it by defendant on other contracts but the payment of which has been withheld.

 No proof was offered by plaintiff in support of the allegation in its petition that under the contracts sued on defendant was indebted to it in the amount of $23,602.30 (later acknowledged by plaintiff to be $23,601.30). The only basis in the record upon which to make a determination as to the amount plaintiff is entitled to receive under the contracts is the admission in defendant's answer and counterclaim that it was withholding the sum of $23,092.57 due plaintiff on those contracts as well as additional amounts due plaintiff on other contracts making a total of $23,237.57 as the amount alleged by defendant to be withheld. The later introduction of the Certificate of Indebtedness issued by the General Accounting Office against plaintiff shows the actual amount being withheld to be $23,244.56. Plaintiff is entitled to a

credit in this amount against the amount due on defendant's counterclaim. Plaintiff's petition will be dismissed and judgment will be entered for defendant on its counterclaim against plaintiff in the sum of $648.96.

It is so ordered.

JONES, Chief Judge, and MADDEN, Judge, concur.

LARAMORE and WHITAKER, Judges, took no part in the consideration and decision of this case.

---

2. The practice of waiting until this stage to seek the admission of evidence is not favored. It is permitted here not on the ground that this particular evidence is "newly discovered", for such is clearly not the case, but because failure to consider it at this time would deny relief to defendant on what is otherwise a meritorious counterclaim.