**ELMORE MOVING AND STORAGE, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

No. 87–1191.

United States Court of Appeals, Federal Circuit.

May 3, 1988.

Donald O. Ferguson, Gardner, Ferguson, Sommers & Davis, San Antonio, Tex., for appellant.

---

Frank B. Flink, Jr., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and M. Susan Burnett, Asst. Director.

Before NIES and ARCHER, Circuit Judges, and SKELTON, Senior Circuit Judge.

ARCHER, Circuit Judge.

Elmore Moving and Storage, Inc. (Elmore) appeals from the decision of the Armed Services Board of Contract Appeals (ASBCA or board), *Elmore Moving & Storage, Inc.*, ASBCA Nos. 29990 and 30136, 87–1 BCA (CCH) ¶ 19,383 (Sept. 3, 1986), which sustained the contracting officer's decision finding Elmore liable to the Government in the amount of $94,085 for fire damage to household goods stored in Elmore's warehouse and denying Elmore's claim for $7,836.17 for work done to avoid or mitigate the damage. We reverse and remand.

## I.

On December 1, 1979, Elmore entered into Contract No. DAHC21–80–G–1509S with the Department of the Army for the storage of household goods owned by military personnel. On May 9, 1984, a fire was discovered in the overseas shipping crates stored in Elmore's outside open storage area located at the rear of its warehouse at 324 Springfield Road, San Antonio, Texas. The parties stipulated that this fire was started by "arsonists." The board found that the use of this term was meant to convey that the two juveniles involved intentionally set the fire; however, they were not prosecuted. The children, who had been playing in the shipping crates, had obtained access to them through a hole in a fence surrounding the property. The crates were stacked at least 50 feet from the warehouse, which was constructed of corrugated metal with fiberglass insulation. Although flames from the burning crates never reached the warehouse, radiated heat from the fire was sufficiently intense to traverse the 50 foot gap and to ignite the stored goods inside the warehouse.

The contracting officer and the board determined that Elmore was liable to the Government in the amount of $94,085 for the damaged or destroyed household goods stored inside the warehouse. Liability was based on Elmore's failure to exercise reasonable care with regard to the goods because of the manner in which the crates were stored in the open storage area behind the warehouse and because children were not adequately prevented from playing in the open storage area.

## II.

The scope of our review of the board's decision is limited by statute. 41 U.S.C. § 609(b) (1982). While the board's conclusions of law are freely reviewable, *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed.Cir.1986), our review of its findings of fact is restricted to a determination of whether those findings are fraudulent, arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, or unsupported by substantial evidence. *Id.; Erickson Air Crane Co. of Washington, Inc. v. United States*, 731 F.2d 810, 814 (Fed.Cir.1984). *See also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)) (substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). One of our predecessor courts has held that a determination of whether a contractor is free from fault or negligence is a finding of fact. *Automatic Screw Products Co. v. United States*, 169 F.Supp. 951, 145 Ct.Cl. 94, 97 (1959); *Whitlock Corp. v. United States*, 159 F.Supp. 602, 607, 141 Ct.Cl. 758 (1958).

The extent of Elmore's liability for care of the goods and the standard of care to be exercised was set forth in section CA–4a of the contract, which states in pertinent part:

Except as hereafter provided ... the contractor shall be liable ... for any loss or

damage to household goods deposited with it caused by its failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but the contractor shall not be liable for any loss or damage to household goods which is caused by acts or conditions beyond its control and without its fault or negligence....

Under this provision Elmore was required, in order to avoid liability, to show that the loss of the goods was not caused by its fault or negligence. *See* 4A McBride and Wachtel, *Government Contracts,* § 30.150[5] (Release 227, 1983). *See also Meeks Transfer Co.,* ASBCA No. 11819, 67–2 BCA (CCH) ¶ 6567, 30468, 30472–73 (1967); *Sloan's Moving & Storage Co.,* ASBCA No. 10187, 65–1 BCA (CCH) ¶ 4685, 22373, 22379–80 (1965).

### III.

A. Storage of the overseas shipping crates.

Elmore contends that it exercised reasonable care with respect to the household goods stored in the warehouse and that loss of the goods was not due to its fault or negligence. It claims specifically that there was not substantial evidence to support the board's findings that it was negligent in the manner in which it stored overseas packing crates or that the rapid spread of the fire through the entire storage area could have been anticipated.

At the time of the fire approximately 450 wooden storage crates were being stored in Elmore's open storage area, a rectangular black top area about 100 feet wide and about 85 feet long located behind the warehouse that was damaged. The crates, which had all the used packing material and other trash removed from them and the tops nailed shut, were stacked closely together, with aisles less than 2 feet wide. The stacks were located at a distance of

about 50 feet from the rear wall of the warehouse.

The storage contract required Elmore to comply with recognized local and national fire ordinances or codes. Ms. Risinger, the sole owner of Elmore's stock shares at the time of the board hearing, and Mr. Webster, the former contracting officer, testified, and the board concluded, that the contract required that the crates be stored no closer than 20 feet from the warehouse.[1] The board found that Section 12 of the fire code applicable to Elmore *recommended, but did not require,* that materials stored in outside storage areas "be stored in unit piles as low in height and small in area as is consistent with good practice for the materials stored," and that "aisles be maintained between individual piles, between piles and buildings and between piles and the boundary line of the storage site." The purpose of these aisles was to "reduce danger of spread of fire from pile to pile and to permit ready access for fire fighting, emergency removal of material or for salvage purpose." Section 14 of the code recommended a clearance of at least *15 feet* between buildings and "open yard storage," but further recommended maintaining as much clear space as practicable. A clearance of 50 feet was recommended for warehouses of wood frame construction, or containing hazardous operations. However, Elmore's warehouse was constructed of corrugated metal.

The record shows that Elmore's premises were inspected regularly by the Government and by the San Antonio Fire Department and, although minor discrepancies were occasionally found, no serious safety hazards were reported. Chief Fuentes, a fire chief for the city of San Antonio, testified that he inspected Elmore's warehouses on August 22, 1983 and found no violations of any city ordinances. Mr. Whittaker, the Government inspector, noted no instances

---

1. Fire protection standards published by the Department of Defense in its *Personal Property Storage Handbook For Contractors,* March 1983, and referred to as "minimum requirements to assure reasonable protection and prevention from having a serious warehouse fire" include a provision that "storage of packing material, pallets, containers, and other combustible material on or near loading docks, under awnings, canopies, or within 20 feet of the warehouse is not permitted during non-business hours." *See also Simpson Transfer and Storage Corp.,* ASBCA No. 24750, 82–2 BCA (CCH) ¶ 15949, 79062–63 (1982).

of "hazards ... within 50 feet of [the] warehouse," "inadequate security," or "improper aisle and/or stacking clearance" in an inspection conducted on January 2, 1984, some four months before the fire, and gave Elmore the highest possible rating on the Warehouse Inspection Report indicating that no deficiencies were observed. In addition, the board stated that "[Elmore] was not required to provide aisles among the crates over the years" and that it was simply not credible that this condition would not have been observed by the inspectors. The board concluded that the inspectors had not observed a recognizable fire hazard over a period of ten years and had not made any adverse comment on their inspection reports as to Elmore's method of storing and stacking the crates or as to the width of the aisles.

Undisputed testimony in the record also shows that the set-back distance used by Elmore was in conformance with the practice of others in the warehousing industry. Mr. Taber, owner of Sherwood Van Lines, testified that his staff was familiar with Elmore's facilities and that they considered Elmore to be a high quality operation which followed all safety procedures. He also stated that, with respect to his firm, he required combustible materials, such as wooden crates, to be stored at least 50 feet away from a warehouse. Mr. Andis testified that his employer, Burnham Service Corporation, was a large United States carrier and that it similarly required wooden crates to be stored at least 50 feet away from a warehouse. Mr. Andis further stated that Elmore was rated among the best of Burnham's franchisees and that, during routine inspections of Elmore's facilities, he had observed Elmore's compliance with the 50 foot distance requirement. The board specifically found that the gap between the crates placed in the open storage area and the rear wall of the warehouse was about 50 feet. This was more than twice the distance required by the contract or recommended by the applicable fire code. *Cf. H & R Transfer & Storage Co.*, ASBCA No. 8079, 1964 BCA (CCH) ¶ 4315 (1964) (wooden shipping crates stacked no more than four feet from its warehouse constituted

negligence); *Simpson Transfer and Storage Corp.*, ASBCA No. 24750, 82–2 BCA (CCH) ¶ 15949 (1982) (violation of requirement that wooden crates not be stored within 20 feet of warehouse constituted negligence).

Notwithstanding this evidence of compliance with the fifty foot set-back required by others in the industry and with the set-back requirements of the contract and the fire code, the board concluded that the failure to maintain aisles, as recommended by the fire code, was negligent. It reasoned that the purpose of the aisles was to reduce the danger of a fire spreading and to permit access of fire fighting equipment, and that the lack of any aisles, therefore, created a firestorm hazard and a foreseeable risk of harm to goods located in the warehouse 50 feet away.

■ Even if the board's conclusion that a firestorm was the foreseeable consequence of Elmore's method of stacking the shipping crates were correct, it does not follow that Elmore was negligent in its storage and handling of goods inside the warehouse. While neither the mandatory requirements of the contract nor the recommendations of the fire code would fix the limits for a finding of negligence, in order for an act to be considered negligent, it must involve a risk which could or should have been foreseen by the actor. Restatement (Second) of Torts § 289 comment b (1965). We find nothing in the record to indicate that fire damage to household goods inside the warehouse could or should have been foreseen from the location and manner of stacking the crates in the outside storage area even if a fire should rapidly spread among them. Elmore had substantially exceeded the requirements of the contract and the recommendation of the fire code in placing the wooden crates approximately 50 feet from the warehouse and, in doing so, had followed set-back requirements acceptable to others in the warehousing industry. As to the lack of aisles, Mr. Andis testified that the recommended aisle widths represented an ideal very seldom achieved in actual practice. The fire code provisions relating to aisles

were not enforced and the periodic inspections had not disclosed any fire or safety hazards. Finally, Mr. Webster testified that, under general conditions, he would not expect a hazard located 50 feet away to have any effect on a building and that the amount of heat generated by the burning crates at Elmore's facility was "unsuspected."

Despite the fact that Elmore did not provide for aisles of the recommended widths in its outside storage area, we conclude that there is not substantial evidence to support the board's finding that the loss or damage to the household goods stored inside of the warehouse was caused by Elmore's fault or negligence.

### B. The fence and the children.

█ The applicable fire code also recommended, but did not require, that "the entire property be surrounded by a fence or other suitable means to prevent access of any unauthorized persons." Elmore's property was fenced, but evidence established that at the time of the fire there was a hole in the fence a short distance away from where the fire had been started and that a well worn path led from a neighboring public housing complex to the hole. The board found that Elmore had a problem with children repeatedly gaining access to the outside storage area and using the crates as a clubhouse. It also found that efforts were made to repair the fence, although not by professionals. The evidence showed that when the hole in the fence was repaired by Elmore's employees, the children from the housing complex would cut it open again.

Elmore tried in several ways to prevent unauthorized access to its property. In addition to fencing the property and attempting to keep the fence repaired, the testimony indicates that Elmore employed security devices such as silent alarms and motion detectors on its warehouses. It considered the possibility of acquiring guard dogs to patrol the property or of electrifying its fence, but was advised by the police and insurance agents against pursuing either of these options because of potential tort liability. It also employed a security guard service for a short time, but found the guard service to be unreliable. It notified the police when it became aware that children were playing in an adjoining vacant lot and, at the suggestion of the police, directed its employees to clean off that lot. Moreover, there was no indication that Elmore's warehouses were located in a high crime area or that arson had been a problem in the past. *See Simpson Transfer & Storage,* 82–2 BCA (CCH) at 79,070.

The board concluded that Elmore's owners "knew or should have known about the condition of the fence and the use being made of their property by the children." Although there was no finding by the board, and apparently no evidence, that the trespassing children previously had been playing with matches or starting fires on Elmore's premises or elsewhere, the board opined that "[i]t is common knowledge that children will play with matches and will often start fires," and that "it could be anticipated that the children might start a fire." Even assuming it was proper for the board to notice judicially such facts, and assuming that the crates were not adequately protected despite Elmore's repeated attempts to prevent trespassers from entering its property, it is not the loss of the crates which is at issue. As we stated earlier, there is nothing in the record to indicate that damage to goods inside the warehouse could have been foreseen even if a fire spread among the crates. To impose a liability for negligence on Elmore under the circumstances is unwarranted.

### CONCLUSION

Based on our analysis and review of the record, we are unable to conclude that substantial evidence supports the board's finding that Elmore "failed to exercise such care ... as a reasonably prudent owner would ... and that the fire ... was not beyond the control or without the fault or negligence of [Elmore]." Accordingly, we reverse the decision of the board holding Elmore liable for damages and remand for a consideration of Elmore's claim.

## COSTS

Costs to Elmore.

REVERSED AND REMANDED.

NIES, Circuit Judge, dissenting.

The issue is whether substantial evidence supports the board's finding that appellant was negligent in stacking 450 wooden packing crates closely together which, when set afire by children, created a firestorm with such intense heat that household goods stored in a metal-walled warehouse fifty feet away were burned. Was there sufficient evidence supporting that finding that, had trial been before a jury, the question could not be taken from the jury? *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Corning Glass Works v. United States Int'l Trade Comm'n*, 799 F.2d 1559, 1566, 230 USPQ 822, 826 (Fed.Cir.1986). Clearly, there was.

### *The Distance Between the Crates and the Warehouse does not Negate Appellant's Negligence*

The majority's reversal is based primarily on the premise that the contract required appellant to store the 450 crates only twenty feet from its warehouse and that appellant provided a clearance of more than twice that distance. Appellant itself tells us that the only contract clause relating to any area outside the warehouse is the following:

> Care shall be exercised to ensure that household goods are not exposed to hazardous materials or operations inside or outside the warehouse.

The confusion apparently arises from the board's imprecise statement that "[t]he contract required that the crates be stored no closer than 20 feet from the warehouses." *Elmore Moving & Storage, Inc.*, ASBCA Nos. 29990, 30136, 87–1 BCA (CCH) ¶ 19,383, at 97,999 (Sept. 3, 1986). The majority relies on that statement and the testimony of Mr. Webster, the former contracting officer, and the warehouse

owner's testimony to establish its erroneous premise. The record shows Mr. Webster testified concerning storage contracts generally and stated that twenty feet was the *minimally* acceptable cleared area inasmuch as some storage operators had no more than that much space. But that minimum distance applies to even one crate. Per Webster, "If it was a hazardous type operation, it had to be farther than that or it wouldn't even be allowed at all in some cases." Assuming a twenty-foot area free of all debris was the minimum requirement, that provides no escape from liability for the creation of a firestorm hazard at twenty-one feet, at fifty feet, or at any distance if the hazard was a foreseeable threat to the stored goods. Whether there was a foreseeable hazard depends on the combination of such variables as the number of crates, how they were stacked, what they were made of, how far they were from the warehouse, and the construction of the warehouse itself.[1] Distance alone is not determinative. In response to questioning by the board, Mr. Webster specifically acknowledged that even a fifty-foot clearance would not protect a warehouse operator from liability in all cases.

### *The Fire Codes are Pertinent to the Finding of Appellant's Negligence*

Appellant argues that the contract required it to follow the fire codes only with respect to the manner of storage *within* a warehouse itself, not outside. Thus, it asserts the board erred, as a matter of contract interpretation, in applying to the instant facts any provisions of the fire code relating to outside storage. The fire codes recommend no less than ten-foot wide aisles between discrete piles of crates stored in the yard regardless of distance from any building. The aisles serve as firebreaks and allow fire equipment to move among the stacks. The purpose of the outside storage code recommendations is to protect goods *in* the warehouse from a firestorm in the yard. Thus, the outside

---

1. The majority discards the fire code recommendation of fifty feet of clearance from wood-framed buildings because appellant's building had corrugated-metal walls. That is a *non sequitur*. Moreover, appellant does not make that argument.

storage recommendations are pertinent with respect to the question of whether appellant satisfied the contract provision mandating that stored goods not be exposed to a hazardous operation *outside* the warehouse.

Next, appellant argues that, even if the contract made the fire codes applicable to its outside storage area, the codes merely provide recommendations, not requirements, and thus, it was not bound to comply with them. The majority buys that argument in exonerating appellant from liability. No authority exists that the mandatory requirements of the fire codes fix the limits for a finding of negligence.

Whether a hazard existed in the yard which endangered the goods in violation of the contract was the sum of variables. The precise recommendations of the code need not be treated as mandatory to constitute evidence pertaining to appellant's lack of prudent care, and the board did not hold appellant liable simply because it failed to comply with the recommendation of at least ten-foot wide aisles among the crates. Rather, the board found that appellant's manner of stacking a *maximum* number of crates into essentially a *single* pile [2] within fifty feet of the metal-walled warehouse created a foreseeable hazard to the stored goods. Per the board, while the flames from the fire did not reach the warehouse, the radiated heat was so intense that it heated the metal wall and set fire to the household goods stored inside. It properly rejected appellant's excuse that appellant necessarily had to store the crates close together on a limited area of pavement because appellant's forklifts could not operate on unpaved areas. That excuse is patently specious.

Appellant also argues that the lack of aisles between stacks of crates had no causal connection to the loss of goods because the fire was so hot by the time the fire fighters arrived (without undue delay) that it melted their equipment, and the aisles could not have been used in any event. However, it is unchallenged that the absence of aisles creating discrete piles of crates was the reason for the firestorm and that, if a firestorm occurred at that distance, the stored goods were at risk in a metal-walled warehouse. Thus, considering the record as a whole, the finding by the board that appellant created a potential firestorm hazard with the foreseeable consequences of damage to stored goods is reasonable, i.e., supported by substantial evidence.

The majority overturns the board's finding of negligence by a selective culling of the record supplemented with original fact-finding. It looks for evidence to support a contrary finding rather than for evidence supporting the board's finding, as required by the "substantial evidence" standard of review. *See Fischer & Porter Co. v. United States Int'l Trade Comm'n,* 831 F.2d 1574, 1577, 4 USPQ2d 1700, 1701–02 (Fed. Cir.1987).

The majority relies on evidence of an inspection report four months before the fire in which no citation was given for "improper aisle and/or stacking clearance." Appellant submitted the report to show past compliance with fire codes and to establish its general reputation for fire safety. The majority assumes, without any foundation, that conditions were the same four months later (in May at the start of the busy period) and erroneously implies that the report approved the absence of aisles in a pile of 450 crates.

In addition to the nonmandatory nature of the code specifications, the majority relies on testimony of a warehouse operator that the recommended minimum aisle width was seldom achieved in practice. Although it may be that warehousemen provide aisles less than the ten-foot minimum, no one testified that two-foot aisles, which is effectively *no aisles at all,* among 450 crates was standard industry practice, or that that number of crates could be stacked without vehicle-wide aisles within fifty feet of a metal-walled building without creating a foreseeable hazard to stored goods.

---

**2.** The board's finding that there was a single pile of crates is unchallenged. Two-foot aisles provide no access by fire equipment and are the same as no aisles at all.

### The Fence and the Children

Appellant urged that it cannot be held negligent because children intentionally set the fire. No authority exists for such a sweeping rule of law. It then argues that the board could not rely on out-of-court statements by its foreman, to the effect that children coming through the hole in the fence were a continuing problem, because the foreman tried to extort money from appellant. However, the foreman's statements were corroborated partially by physical examination by officers on the scene and by photographs showing a well-worn path to the opening. Further, appellant was found to be aware of one such incident, at least. Thus, evidence supports the board's finding that the owners knew or should have known about the condition of the fence and the children using their property.

The majority finds an excuse for appellant not keeping its fence in repair because a fence is only recommended, not required, by the fire code. It then goes on to criticize the board for relying on "common knowledge that children will play with matches and will often start fires" and overturns the board's finding of a causal connection between the unrepaired hole in the fence, the children, and the fire. The majority would require evidence that the children had set fires previously on the property before attaching any significance to the unrepaired hole in the fence. Because of the absence of such evidence, the majority discounts an important factor which supports the finding of negligence.

### Conclusion

In view of the ample evidence supporting the board's finding of negligence, the majority pays only lip service to our standard of review in reversing.

For the above reasons, I would affirm the board.